# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JAMES MARKS, ET AL** | * | **CIVIL NO. 6:15-1735** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **WESTWIND HELICOPTERS, INC.** | * | **MAGISTRATE JUDGE WHITEHURST** |

## REPORT AND RECOMMENDATION

Pending before me for report and recommendation is Rolls-Royce Corporation's ("Rolls-Royce") Fed. R. Civ. P. 12(b)(2) and 12(b)(6) Motion to Dismiss Plaintiff James Marks' ("Marks") First Amended Complaint for Damages, filed on September 30, 2015 [rec. doc. 52]. Marks filed opposition on October 28, 2015 [rec. doc. 65]. Rolls-Royce filed a reply on November 6, 2015 [rec. doc. 71]. Oral argument was held on December 7, 2015, after which the motion was taken under advisement.

For the following reasons, it is recommended that the motion be **DENIED**.

## I. BACKGROUND

On or about May 30, 2014, plaintiff, Marks, was employed by CB&I Offshore Services, Inc. ("CB&I"), as a foreman, and was assigned to oversee maintenance work being performed on a production platform located at Eugene Island 182A in the Gulf of Mexico south of Morgan City, Louisiana. [rec. doc. 46, Marks' First Amended Complaint for Damages ("Marks Amended Complaint"), ¶5]. Plaintiffs, Shannon James ("James"), Canard Powell ("Powell"), and Joey Ganson ("Ganson"), were employed by L&L Sandblasting/CB&I Offshore Services, Inc. ("L&L") to do blasting and painting work on the platform. [James, Powell and Ganson's First Amended Complaint for Damages ("JPG Amended Complaint"), rec. doc. 47, ¶ 5]. That day, the four workers boarded a Bell 407 helicopter bearing FAA registration number N1197 for transport from the Eugene Island 182A platform to shore. [Marks Amended Complaint, ¶ 6; JPG

Amended Complaint, ¶ 6].

Shortly after takeoff, the helicopter experienced a sudden loss of power, causing the pilot to deploy the emergency flotation system and crash into the Gulf of Mexico.  [Marks Amended Complaint, ¶ 12].  Plaintiffs allege that as a result of the crash, they suffered severe injuries. [Marks Amended Complaint, ¶ 26].

GM Leasing Company, LLC ("GML"), a Louisiana limited liability company with its operations headquarters located in the Parish of Lafayette, was the owner of the helicopter. [Marks Amended Complaint, ¶¶ 2, 7; JPL Amended Complaint, ¶ 7].  GML purchased the helicopter from Bristow US., LLC ("Bristow") in February, 2011.  [rec. doc. 63, Exhibit G, Declaration of David Guidry ("Guidry Decl."), ¶ 2].  The sales agreement provided that the aircraft was to be delivered from Bristow's possession in New Iberia, Louisiana, to GML's possession in Broussard, Louisiana.  [Guidry Decl., ¶ 3; Ex. G-1].

Westwind Helicopters, Inc. ("Westwind"), a foreign corporation organized under the laws of the State of Texas with its principal place of business located in the County of Galveston, was the operator of the helicopter.  [Marks Amended Complaint, ¶¶ 2, 8].  A Westwind employee piloted the  helicopter.  [Marks Amended Complaint, ¶ 8].  Westwind performed all maintenance and safety inspections on the aircraft.  [Marks Amended Complaint, ¶ 9].

Rolls-Royce, a Delaware Corporation with its principal place of business in Indianapolis, Indiana, was the manufacturer of the M250 series engine and turbine which were installed in the helicopter.  [Marks Amended Complaint, ¶¶ 2, 11; rec. doc. 52, Declaration of Scott S. Scheurich ("Scheurich Decl."), ¶ 24].  General Motors' Allison Gas Turbine Division manufactured and sold the outer combustion case on the engine and turbine as a spare part to Dallas Airmotive,

headquartered in Dallas, Texas, on July 7, 1989.[1]  [Scheurich Decl., ¶ 9].

On October 31, 2000, Rolls-Royce sold and shipped the engine to Rolls-Royce Engine Services, Oakland, California ("RR Oakland"), a separate corporation from Rolls-Royce. [Scheurich Decl., ¶ 12].  From there, the engine was provided to AcroHelipro Global Services ("AHGS") in August 2006.  [rec. doc. 63, Exhibit W, Declaration of Ron Webster ("Webster Decl."), ¶  2].  In October 2006, the engine was transferred from AHGS to the U.S. Department of Homeland Security ("Homeland Security").  [*Id.*].

In September, 2011, Homeland Security sold the engine to Arrow Aviation, which repairs and maintains helicopters for GML.  [Webster Decl., ¶¶ 1, 3].  Arrow Aviation then installed the engine into the Bell 407 helicopter, which was sold to GML.[2]  [Webster Decl., ¶ 4].

Rolls-Royce sold and shipped the turbine module at issue (CAT 45069) to Bell Helicopter Canada on September 30, 2005.  [Scheurich Decl., ¶ 10].  On June 14, 2013, another turbine module (CAT 95319) was installed on the subject engine.  [Scheurich Decl., ¶ 13].  On or about August 30, 2013, the installed turbine module (CAT 95319) was removed from the subject engine.  [Scheurich Decl., ¶ 14].  On August 30, 2013, the turbine module at issue (CAT 45069) was installed onto the subject engine.  [*Id.*].

Aviall, Inc. ("Aviall"), is the dealer/distributor of Rolls-Royce engines and parts for Louisiana, and has a location in Broussard, Louisiana, located on Rolls Royce Dr.  [rec. doc. 63, Exhibit M, Declaration of Myron Hillers ("Hillers Decl."), ¶ 4].  According to Rolls-Royce's

---

[1]In the original complaint, Marks alleged a defect in the outer combustion case.  [rec. doc. 1, ¶¶ 12, 13]. Plaintiff amended the complaint to allege that an unspecified defect in the engine caused the outer combustion case to crack.  [rec. doc. 46, ¶¶ 13, 14].

[2]Webster indicates that Arrow Aviation "sold the helicopter with the subject engine to GM Leasing." [Webster Decl., ¶ 4].  This contradicts Guidry's statement that the helicopter was purchased by GML from Bristow. Guildry Decl., ¶ 2].

website, Aviall is the parts distributor for the "gold fleet" of Rolls-Royce M250 engines pursuant to a distribution arrangement with Aviall.  [Hillers Decl., ¶ 5; Exhibit M-1].  Rolls-Royce has a Louisiana-specific representative, Carl Landriault ("Landriault"), who is located in Baton Rouge, Louisiana and is Rolls-Royce's contact for Louisiana Rolls-Royce engine customers.  [Hillers Decl., ¶ 6; Exhibit M-3].

Rolls-Royce's website advertises that Rolls-Royce Indianapolis "has become a leading industry supplier in the US with a significant and growing presence."  [rec. doc. 63, Declaration of Alex Whitman ("Whitman Decl."), ¶ 2, Exhibit A-1].  The website states that Rolls-Royce North America, Inc. is "the company's regional corporate headquarters," and that it provides "management direction and corporate support for all Rolls-Royce business and operations in the region, encompassing more than 7,000 employees at 66 locations across the US and Canada."  [Whitman Decl., ¶ 3; Exhibit A-2].  Among the company's global businesses listed on the website are Rolls-Royce Helicopters in Indianapolis, Indiana, and Rolls-Royce Engine Services - Oakland.  [Whitman Decl., ¶ 3; Exhibit A-2].

The Rolls-Royce website advertises its M250 engine as powering the Bell 407 helicopter.  [Whitman Decl., ¶ 6, Exhibit A-4].  Bell Helicopter's website advertises the "Oil & Gas" specific Bell 407 helicopter as having a Rolls-Royce engine.  [Whitman Decl., ¶ 9, Exhibits A-7, A-8 and A-9].

The U.S. Bureau of Ocean Energy Management's website section on Oil and Gas Energy Programs publishes a September 1, 2015 map of Oil & Gas Leasing Programs for Gulf of Mexico providing leasing information of oil and gas rigs throughout the Gulf.  [Whitman Decl., ¶ 7, Exhibit A-5].  The map shows that the "Central Planning Area" below Louisiana and, to a lesser extent, Mississippi and Alabama, well eclipses the other Gulf areas below Texas and

Florida.  [*Id*.].  The "Central Planning Area" also has vastly more oil and gas rigs than any other area, including the Pacific and Alaska.  [Whitman Decl., ¶ 8].

On May 20, 2015, Marks filed an admiralty and maritime claim under 28 U.S.C. § 1333 in this Court, alleging claims against GML and Westwind for negligence, and against Rolls-Royce under the Louisiana Products Liability Act ("LPLA") and for negligence.  Specifically, Marks alleges that the engine and/or a component part of the engine sold by Rolls-Royce and incorporated into the helicopter had a defect and malfunctioned, ultimately causing the crash.

Westwind filed an Answer and Cross-claim against Rolls-Royce on June 12, 2015.  [rec. doc. 3].  CB&I filed a Complaint of Intervention on July 29, 2015.  [rec. doc. 33].

On June 16, 2015, this suit was consolidated with related actions filed in this Court by James, Powell, and Ganson.  [rec. doc. 11].  On July 14, 2015, Rolls-Royce filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(2) and/or 12(b)(6) or, alternatively, for a more definite statement under Fed. R. Civ. P. 12(e), against James, Powell and Ganson.  [rec. doc. 13].  On July 20, 2015, Rolls-Royce filed a motion to dismiss against Marks.  [rec. doc. 16].  Rolls-Royce filed a motion to dismiss Westwind's Cross-Claim on July 20, 2015.  [rec. doc. 17].  On August 8, 2015, Rolls-Royce filed a motion to dismiss CB&I and American Longshore Mutual Association, Ltd.'s ("ALMA") Complaint of Intervention.  [rec. doc. 34].

On August 10, 2015, Magistrate Judge C. Michael Hill held a telephone hearing on the motions to dismiss, in which he allowed plaintiffs and Westwind 30 days to file amended complaints and a cross-complaint, and dismissed the motions as moot.  [rec. doc. 38].  On August 17, 2015, Judge Hill issued an Order dismissing as moot Rolls-Royce's motion against CB&I and ALMA.  [rec. doc. 45].

On September 9, 2015, Marks filed a First Amended Complaint for Damages.  [rec. doc.

46].  James, Powell and Ganson filed a First Amended Complaint for Damages on September 9, 2015.  [rec. doc. 47].  Westwind filed a First Amended Answer to Plaintiff's Complaint for Damages and Cross-Claims against Defendant Rolls-Royce Corporation on September 9, 2015. [rec. doc. 48].

On September 30, 2015, Rolls-Royce filed the instant motions to dismiss.  [rec. docs. 52, 53, 54].

## II. ANALYSIS

### A.  Motion to Dismiss under Rule 12(b)(2)

Rolls-Royce argues that the Court should dismiss Marks' amended complaint because of lack of general or specific jurisdiction over Rolls-Royce.

Personal jurisdiction "is an essential element of the jurisdiction of a district court, without which it is powerless to proceed to an adjudication." *721 Bourbon, Inc. v. House of Auth, LLC*, — F.Supp.3d —, 2015 WL 6134069, at *2 (E.D. La. Oct. 19, 2015) (*citing Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)). When a nonresident defendant moves the court to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden to show that personal jurisdiction exists. *Id.* (*citing Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)). When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the nonmoving party need only make a *prima facie* showing; "[p]roof by a preponderance of the evidence is not required." *Id.* (*quoting Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)).

The allegations of the complaint, except as controverted by opposing affidavits, must be taken as true, and all conflicts in the facts must be resolved in favor of plaintiffs. *Id.* (*citing*

*Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985)).  In making its determination, the Court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Id.* (citing *Revell*, 317 F.3d at 469).

A court has personal jurisdiction over a nonresident defendant if (1) the forum state's long-arm statute confers personal jurisdiction over that defendant, and (2) the forum state's exercise of jurisdiction complies with the Due Process Clause of the Fourteenth Amendment.  *Id.* (*citing Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)).  Louisiana's long-arm statute permits the exercise of personal jurisdiction over a non-resident who acts directly or by an agent, as to a cause of action arising from "[m]anufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, expected, or anticipated that he product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices" or " on any basis consistent with the constitution of this state and the Constitution of the United States."  LA. REV. STAT. § 13:3201 *et seq*.  Because Louisiana's long-arm statute extends jurisdiction to the full limits of due process, the Court's focus is solely on whether the exercise of its jurisdiction in this case satisfies federal due process requirements.  *Id.* (*citing Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 336 (5th Cir. 1999).

The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, — U.S. —, 131 S.Ct. 2846, 2853, 180 L.Ed.2d 796 (2011) (*citing Shaffer v. Heitner*, 433 U.S. 186, 207, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).  To determine whether due process permits the exercise of personal jurisdiction, the Court asks whether two requirements are met.  *Eddy v. Printers House (P) Ltd.*, — F. App'x —, 2015 WL 5771925, at *2 (5th Cir.

Oct. 2, 2015).  First, the nonresident defendant must have "purposefully availed [itself] of the benefits and protections of the forum state by establishing ˜minimum contacts' with the forum state." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).  Second, the exercise of jurisdiction over that defendant must not offend 'traditional notions of fair play and substantial justice." *Id*.; *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999).  If either of these requirements is not satisfied, a district court may not exercise personal jurisdiction over the nonresident defendant. *Eddy*, at *2.

Marks concedes there is no general jurisdiction, and that only specific personal jurisdiction exists over Rolls-Royce in Louisiana under the "stream-of-commerce" theory.  Thus, the Court's inquiry focuses on whether Rolls-Royce had sufficient contacts with Louisiana to support the exercise of specific jurisdiction.

Specific jurisdiction over a nonresident corporation is appropriate when that corporation has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities. *Alpine View*, 205 F.3d at 215 (*quoting Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).  In cases involving products sold or manufactured by foreign defendants, the Fifth Circuit applies the "stream-of-commerce" approach to personal jurisdiction. *Ainsworth v. Moffett Engineering, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013).  The stream-of-commerce principle refers to "the regular and anticipated flow of products from manufacturer to distribution to retail sale." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 117, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

Marks asserts that jurisdiction exists under the stream-of-commerce theory because Rolls-Royces' contacts with Louisiana are a result of the company placing helicopter engines and

turbines into the stream of commerce with the expectation that they will be sold in this state.  By its motion, Roll-Royce argues the engine and turbine did not actually enter the stream of commerce as that term is general understood, *i.e.*, "the regular and anticipated flow of products from manufacturer to distribution to retail sale."  *Asahi*, 480 U.S. at 107.  Rather, Rolls-Royce contends that these products made their way to Louisiana in a "zig-zag" version of stream of commerce through a series of fortuitous events independent of the distribution channel.

One of the first cases relying solely on the stream-of-commerce theory to justify a state's exercise of jurisdiction over a nonresident manufacturer was *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.Ed.2d 761 (1961).  *Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315, 1318-19 (5th Cir. 1970)).  In that case, the plaintiff was injured by an allegedly defective safety valve on a water heater manufactured in Ohio.  The Ohio manufacturer sold several of these valves to a Pennsylvania corporation for installation on its water heaters.  One of the heaters was sold in the course of commerce and eventually reached Illinois, where plaintiff's injury occurred.  In finding jurisdiction, the Illinois court stated:

> To the extent that its business may be directly affected by transactions occurring here it enjoys benefits from the laws of this State, and . . .  from the protection which our law has given to the marketing of hot water heaters containing its valves. Where the alleged liability arises, as in this case, from the manufacture of products presumably sold in contemplation of use here, it should not matter that the purchase was made from an independent middleman or that someone other than the defendant shipped the product into this State.

*Id.* at 442.

*Gray* was cited favorably by the Fifth Circuit in *Everly Aircraft Co. v. Killian*, 414 F.2d 591, 596 (5th Cir. 1969), and by the Supreme Court in Supreme Court in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).  *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 201-02 (5th Cir. 1980).  In *World-Wide Volkswagen*, the Supreme Court held:

> [T]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." . . .  "[I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly or indirectly, the market for its product . . . it is not unreasonable to subject it to suit."

*Id.* at 297-98.

After *World-Wide Volkswagen*, the lower courts split over the exact requirements of the stream-of-commerce theory.  *Harlow v. DaimlerChrysler Corp.*, 2005 WL 3543140, at *3 (E.D. Tex. Dec. 22, 2005).  This split was reflected in the Supreme Court's opinion in *Asahi*, *supra*. There, all of the justices agreed that the stream-of-commerce theory provided a valid basis for determining minimum contacts.  However, they could not agree as to the exact requirements of an application of the theory.  Four justices, led by Justice O'Conner, expressed that an exercise of personal jurisdiction required more than the mere act of placing a product in the stream of commerce, but there must be in addition "an action of the defendant purposefully directed toward the forum State."  *Asahi*, 480 U.S. at 112.  The O'Conner plurality's view has become known as the "stream of commerce plus" theory.

Four other justices, led by Justice Brennan, did not believe that the showing of additional conduct was necessary.  The Brennan plurality held that:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.

*Id.* at 117, 107 S.Ct. at 1034 (Brennan, J., concurring).

More recently in *J. McIntyre Machinery, Ltd. v. Nicastro*, — U.S. —, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011), the Court was divided still.  *In re Chinese-Manufactured Drywall*

10

*Products Liab. Litig.*, 753 F.3d 521, 540 (5th Cir. 2014).  Justice Kennedy's plurality opinion

embraced the "stream of commerce plus" test:

> Since *Asahi* was decided, the courts have sought to reconcile the competing
> opinions. But Justice Brennan's concurrence, advocating a rule based on general
> notions of fairness and foreseeability, is inconsistent with the premises of lawful
> judicial power. This Court's precedents make clear that it is the defendant's
> actions, not his expectations, that empower a State's courts to subject him to
> judgment.

*McIntyre*, 131 S.Ct. at 2789.

Justice Breyer's concurring opinion, however, did not explicitly embrace Justice

O'Connor's stream of commerce plus theory, but instead opined:

> I do not doubt that there have been many recent changes in commerce and
> communication, many of which are not anticipated by our precedents. But this
> case does not present any of those issues. So I think it unwise to announce a rule
> of broad applicability without full consideration of the modern-day consequences.
>
> In my view, the outcome of this case is determined by our precedents.

*Id.* at 2791 (Breyer, J., concurring).

Circuit courts interpreting *McIntyre* have concluded that under *Marks v. United States*,

430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), Justice Breyer's concurring opinion

"furnished the narrowest grounds for the decision and controls."  *In re Chinese-Manufactured*

*Drywall Products*, 753 F.3d at 540-41 (*citing Ainsworth*, 716 F.3d at 178; *AFTG-TG, LLC v.*

*Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012)).  As the Fifth Circuit noted in

*Ainsworth*, the narrowest ground, as expressed in Justice Breyer's concurrence, is that the law

remains the same after *McIntyre*, and that circuit courts may continue to attempt to reconcile the

Supreme Court's competing articulations of the stream of commerce test.  *Id.* (*citing Ainsworth*,

716 F.3d at 178-79 (noting that "Justice Breyer's concurrence was explicitly based on Supreme

Court precedent and on *McIntyre's* specific facts" and citing with approval the Federal Circuit's

holding that the *Supreme Court's framework had not changed and that it should apply its circuit precedent interpreting these decisions*).  (emphasis added).

In *Ainsworth*, the Fifth Circuit noted that in cases involving a product sold or manufactured by a foreign defendant, it had consistently followed a "stream-of-commerce" approach to personal jurisdiction, under which the minimum contacts requirement is met so long as the court "finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state."  *Id*. at 177. Under that test, "mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce," but "[t]he defendant's contacts must be more than 'random, fortuitous, or attenuated, or of the unilateral activity of another party or third person.' "  716 F.3d at 177.

Rolls-Royce argues that application of the Fifth Circuit's stream-of-commerce approach is no longer proper after the Supreme Court's decisions in *Walden v. Fiore*, — U.S. —, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014), *Goodyear*, *supra*, and *Daimler AG v. Bauman*, — U.S. —, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014).

In the most recent case, *Walden*, a Georgia police officer seized plaintiffs' cash at an Atlanta, Georgia airport.  When plaintiffs returned to Nevada, they filed suit against the officer, alleging that he violated their Fourth Amendment rights by, among other things, seizing their cash without probable cause and drafting a false affidavit.  In finding that the Nevada district court lacked jurisdiction, the Supreme Court noted that the jurisdictional inquiry is focused on "the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there." *Id*. at 1122.  When the only basis for the exercise of specific personal jurisdiction is "a defendant's relationship with a plaintiff or third party," then jurisdiction will not

12

lie.  *Id*. at 1123.  Applying these principles, the Court concluded that the Nevada district court lacked personal jurisdiction over the officer, who had "never traveled to, conduced activities with, contacted anyone in, or sent anything or anyone to Nevada."  *Id*. at 1124.

While *Walden* addressed specific jurisdiction, the facts of that case are distinguishable. The conduct complained of – search and seizure and execution of an affidavit – all occurred in Georgia.  No part of defendant's conduct occurred in the forum state.  Here, however, the alleged injuries occurred in the forum state of Louisiana.  Thus, *Walden* is inapposite.

As for *Goodyear* and *Daimler*, these cases are inapplicable because both dealt with general jurisdiction.  In fact, *Goodyear* recognized that a manufacturer's placement of a product into the stream of commerce "may bolster an affiliation germane to *specific* jurisdiction." (emphasis in original).  *Id*. at 2855 (*citing World-Wide Volkswagen*, 444 U.S. at 297 (where "the sale of a product . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve . . . the market for its product in [several] States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise *has there been the source of injury to its owner or to others*" (emphasis added)).   That is clearly the case here, where Rolls-Royce marketed its  engine and turbine throughout the United States and its allegedly defective products caused injury to others in Louisiana.

Marks asserts that the Fifth Circuit's stream-of-commerce analysis in *Ainsworth* still applies. While *Ainsworth* was decided before *Daimler* and *Walden*, more recent authority indicates that the stream-of-commerce theory is still viable in this Circuit.  *See In re Chinese Manufactured Products*, 753 F.2d at 541; *Eddy*, 2015 WL 5771925.

In support of its argument that this Court lacks specific personal jurisdiction, Rolls-Royce relies heavily on *Eddy*.   There, plaintiff alleged that he was injured in Waxahachie, Texas by a

13

defect in a printing press manufactured by The Printers House Limited ("THP"), a company incorporated and operated in India.  That press was manufactured for, delivered to, and installed at a commercial printing business in Mississippi.  The Mississippi business sold the press to Graphicartsequipment.com, which then resold the press to American Consolidated Media, the parent company of the Waxahachie Daily newspaper.  Subsequently, the press was installed in Waxahachie, Texas by Al Taber and Associates ("Taber"), which was based in Georgia.  Prior to installing the press, Taber ordered spare parts from TPH, and requested that TPH ship the parts directly to Waxahachie, Texas.  However, plaintiff never alleged that the spare parts caused his injury.

In finding that the Texas court had no jurisdiction, the Fifth Circuit noted that TPH had no other contact with the forum state other than shipping the one order of spare parts to Texas.  The court emphasized that plaintiff had never alleged that the spare parts were actually used in the press or that they caused his injury.  Because plaintiff did not allege that his injury arose out of or related to the activities TPH directed at Texas – *i.e.*, shipping the spare parts – the court found that he had failed to make out a *prima facie* case supporting specific jurisdiction.  *Id*. at *4.

By contrast, Marks specifically alleges that he was injured in Louisiana by the engine and turbine manufactured by Rolls-Royce.  Additionally, unlike TPH, Rolls-Royce expected that its engines and parts would be used in Louisiana.  The company marketed here, where there is a significant presence of offshore helicopters, and had a Louisiana-specific representative here. Accordingly, *Eddy* is inapposite.

Additionally, Rolls-Royce cites *Mullen v. Bell Helicopter*, — F.Supp.3d —, 2015 WL 6755384 (S.D. Miss. Nov. 4, 2015), as being on point with this case.  There, the court held that it had no jurisdiction over HWL, a Georgia-based helicopter leasing company whose aircraft

14

crashed in Mississippi and injured a U.S. Forest Service employee, where that company's *only* connection to the case was that it had leased the helicopter to an operator located in the adjacent state of Louisiana.  (emphasis added).  *Id*. at *3  Significantly, the court observed that the Fifth Circuit has never applied the stream-of-commerce theory to leased products, citing *Sieferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 273-74 (5th Cir. 2006).  *Id*. at *3.  Additionally, while HLW knew its helicopter would be used for U.S. Forest Service operations, it did not know the specific location of these services.  Noting that it "would be unfair to subject [the Georgia company] to personal jurisdiction in Mississippi merely because [the helicopter operator] is a resident of a state adjacent to Mississippi," the court concluded that specific jurisdiction over HLW was not warranted.  *Id*. at *4.

Here, however, Rolls-Royce was not a lessor, but a manufacturer whose products allegedly caused injuries in Louisiana.  Additionally, Rolls-Royce has previously been sued in this state regarding the same type of engine involved in this case and has stipulated to jurisdiction.  *See Phi, Inc. v. Apical Industries, Inc.*, 2014 WL 1820717 (W.D. La. March 7, 2014), *report and recommendation adopted*, 2014 WL 1820859 (W.D. La. May 7, 2014), *reversed and remanded*, 775 F.3d 671 (2014), *cert. denied*, 136 S.Ct. 45 (5th Cir. 2015); *PHI, Inc. v. Rolls-Royce Corporation*, 2010 WL 883794 (W.D. La. 2010); *Landry v. Apache Corp.*, 2008 WL 115190 (W.D. La. 2008).  Accordingly, Rolls Royce could have anticipated being haled into court here.  Further, Rolls-Royce markets throughout the U.S. and has a Louisiana-specific representative, who is Rolls-Royce's contact for Louisiana Rolls-Royce engine customers. [Hillers Decl., ¶ 6].  Thus, *Mullens* is inapplicable.

Based on the authorities from this Circuit, the undersigned finds that the *Ainsworth* stream-of-commerce theory applies, and that this Court has jurisdiction.  Rolls-Royce marketed

its products to Louisiana, which has one of the highest concentrations of helicopters used in the oil and gas industry, and even had a Louisiana-specific representative here.  A dealer/distributer of Rolls Royce engines and parts is located in Broussard, Louisiana.  Additionally, the engine and turbine at issue allegedly injured plaintiffs in this state.  Therefore, this litigation results from injuries that allegedly arise out of and relate to Rolls-Royce's placing its products in the stream of commerce with the reasonable expectation that they would be purchased and used by consumers in Louisiana. Accordingly, the undersigned finds that  Court has specific jurisdiction over Rolls-Royce to adjudicate Marks' claims.

**B.  Motion to Dismiss under Rule 12(b)(6)**

Marks contends that Rolls-Royce is liable for his damages because of its negligence and/or fault under the Louisiana Products Liability Act ("LPLA"), LA. REV. STAT. § 9:2800.51 *et seq*.  By its motion to dismiss, Rolls-Royce argues that while Marks' amended complaint reworded his "defect" allegations, Marks did not remedy the pleading deficiencies.

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' "  *In re Katrina Canal Breaches Litig*., 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted) (*quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' "  *Id.* at 205 (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id*. (*quoting Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555, 127 S.Ct. 1964-65 (citations, quotation marks, and brackets omitted).  The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*citing Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id.*

On July 20, 2015, Rolls-Royce filed its first motion to dismiss against Marks under Fed. R. Civ. 12(b)(6).  [rec. doc. 16].  After a telephone hearing, Magistrate Judge C. Michael Hill allowed Marks 30 days to file an amended complaint.  [rec. doc. 38].  In the Amended Complaint filed on September 9, 2015, Marks asserted claims under the LPLA.  [rec. doc. 46].  Rolls-Royce filed the instant motion to dismiss on September 30, 2015.  [rec. doc. 52].

In its motion, Rolls-Royce asserts that § 402(A) of the Restatement (Second) of Torts applies to maritime products liability cases.  [rec. doc. 52, p. 17 and n. 10].  However, Rolls-Royce concedes that Louisiana's products liability law may be applied to maritime actions when its provisions are consistent with § 402(A).  *Transco Syndicate No. 1, Ltd. v. Bollinger Shipyards, Inc.*, 1 F.Supp.2d 608, 614 (E.D. La. 1998).  But when state law conflicts with the Restatement, the Court should apply the Restatement's rules.  *Cheramie v. Panther Helicopters, Inc.*, 2015 WL 693221, at *3 (E.D. La. Feb. 18, 2015).  For purposes of this motion, the undersigned will assume that the LPLA applies.  *See Landry v. Apache Corp.*, 2008 WL 115190 (parties agreed that the LPLA applied to action for damages suffered by plaintiff when a helicopter powered by a gas turbine engine manufactured by Rolls-Royce crashed into the Gulf

17

of Mexico).

The LPLA establishes the exclusive theory of liability for manufacturers regarding damages caused by their products and is set forth in LA. REV. STAT. § 9:2800.51, *et seq*. *Richard v. Anadarko Petroleum Corp*., 2014 WL 1029898, at *4 (W.D. La. Mar. 17, 2014) (Drell, J.).  The applicable standard under the LPLA is as follows:

> The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

LA. REV. STAT. § 9:2800.54(A).

Liability may attach, if and only if (among other requirements) the product is unreasonably dangerous: 1) in construction or composition, 2) design, 3) because of an inadequate warning, or 4) because it fails to conform to an express warranty.  LA. REV. STAT. § 9:2800.54 (B); *Louisiana Farm Bureau Mut. Ins. Co. v. Leviton Mfg. Co., Inc*., 2015 WL 1221356, at *4 (W.D. La. Mar. 17, 2015) (James, J.).  Ultimately, a cause of action under the LPLA requires proof:

> (1) that the defendant is a manufacturer of the product;
>
> (2) that the claimant's damage was proximately caused by a characteristic of the product;
>
> (3) that this characteristic made the product "unreasonably dangerous;" and
>
> (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

*Richard*, at *4 (*citing Ayo v. Triplex, Inc*., 457 F. App'x 382, 385-86 (5th Cir. 2012)).

In this case, Marks alleges that the Rolls-Royce engine was defective in two of the four categories of defects recognized by the LPLA: design and warning.

### *1) Design*

Under the LPLA, a product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and

> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

LA. REV. STAT. § 9:2800.56.

Thus, to state a claim for defective design under the LPLA, plaintiff must allege, at minimum, an alternative design that was capable of preventing the damage. *Louisiana Farm Bureau*, 2015 WL 1221356, at *6-7 (*citing Flagg v. Elliot*, 2014 WL 4450451, at *4 (E.D. La. Sept.10, 2014), *judgment vacated by Flagg v. Stryker Corp.*, 801 F.3d 456 (2015); *Becnel v. Mercedes-Benz USA, LLC.*, 2014 WL 1918468, at *8 (E.D. La. May 13, 2014).

In the amended complaint, Marks alleged that:

30.

RRC [Rolls-Royce] manufactured the engine installed on the helicopter at the time of the May 30, 2014 incident.

31.

Upon information and belief, the engine installed on the helicopter at the time of the May 30, 2014 incident contained defects in its design and manufacture of such a nature as to cause the premature cracking and failure of the Outer Combustion Case.

32.

19

The defects in the engine's manufacture or design existed at the time the engine left the care, custody, and control of RRC.

33.

On May 30, 2014, the helicopter was forced to make an emergency landing in the Gulf of Mexico due to a loss of engine power, which resulted from the aforementioned defects in the engine, after which the helicopter inverted resulting in substantial damage to the helicopter and injury to Plaintiff, James Marks.

34.

The engine prematurely developed cracks in its Outer Combustion Case as a result of a defect in design or manufacture, rendering it unreasonably dangerous because it deviated in a material way from the manufacturer's specifications or performance standards, industry standards, or from otherwise identical products manufactured by the same manufacturer.

35.

The engine was unreasonably dangerous in design because, when it left RRC's control, an alternative design existed that could have prevented Plaintiff's damages. The likelihood that the product's design would cause Plaintiff's damages and the gravity of those damages outweighed the burden on RRC of adopting such an alternative design and the adverse effect of such alternative design on the utility of the product.

Here, Marks has alleged a plausible claim for defective design.  At this stage, "judicial experience" and "common sense" counsel against dismissal of these claims.  *Louisiana Farm Bureau*, 2015 WL 1221356, at *6-7 (*citing Iqbal, supra*).  Accordingly, the undersigned concludes that Marks' complaint, as amended, states plausible defective design claim under the LPLA, sufficient to afford defendant fair notice of the claim(s) against it, along with the reasonable expectation that discovery will reveal relevant evidence for each of the elements of the claim.  *Id*. (*citing Twombly*, *supra*).

**2) *Failure to Warn***

To maintain a failure to warn claim under the LPLA, "a plaintiff must demonstrate that the

20

product in question has a potentially damage-causing characteristic and that the manufacturer failed to use reasonable care to provide an adequate warning about this characteristic." *Johnson v. Transwood, Inc.*, 2015 WL 5680369, at *7 (M.D. La. Sept. 25, 2015) (*citing Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 264 (5th Cir. 2002)).  To satisfy the first prong of this test, the plaintiff must allege facts as to the "cause, frequency, or consequences" of the dangerous characteristic at issue.  *Watts v. RCA Corp.*, 2015 WL 158898, at *5-6 (W.D. La. Jan. 12, 2015).

Here, Marks alleges that the engine was unreasonably dangerous because when the engine left Rolls-Royce's control, it possessed a characteristic that could cause damage, and Rolls-Royce failed to use reasonable care to provide an adequate warning of this characteristic.  Marks further alleges that Rolls-Royce breached its duty by failing to provide an adequate warning to Westwind that could have prevented Marks' injuries; that Westwind's use of the engine was reasonably anticipated, and that Marks' damages were directly and proximately caused by these unreasonably dangerous characteristics.

Under the LPLA, proximate cause is analyzed using the same duty/risk considerations employed in an ordinary negligence action, *i.e.*, whether the "risk, and harm caused, [was] within the scope of protection afforded by the duty breached."  *Watts*, 2015 WL 158898, at *5 (*citing Traina v. NationsBank of Texas, N.A.*, 2001 WL 1041773 (E.D. La. Sept. 7, 2001) (citations omitted); *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94); 646 So.2d 318, 321-322). Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La. 1991).

Here, Marks alleges  his injuries were caused by Rolls-Royce's failure to warn that when the engine left Rolls-Royce's control, it possessed a dangerous characteristic that could cause damage.

The undersigned concludes that the scope of the duty owed by Rolls-Royce is broad enough to encompass the risk of the harm suffered by Marks.  In sum, at this early stage of the proceedings, Marks' complaint, as amended, states a plausible inadequate warning claim under the LPLA. *Watts*, 2015 WL 158898, at *6.

### III. CONCLUSION

Based on the foregoing, it is the recommendation of the undersigned that the motion to dismiss be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc.72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 20th day of January, 2016, at Lafayette, Louisiana.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**